UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CT-3302-BO

| | | |
|---|---|---|
| TANYA STOCKTON,<br><br>Plaintiff,<br><br>v.<br><br>WAKE COUNTY, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | ORDER |

This case is brought by Tanya Stockton (hereinafter "plaintiff") under 42 U.S.C. §§ 1983 and 1988; the Fourteenth Amendment; North Carolina's wrongful death statute, N.C.G.S. § 90-211.11 et seq.; and other statutory and common law for the alleged unlawful and unconstitutional, wilful and wanton conduct of defendants resulting in the death of her son Ralph Madison Stockton, IV (hereinafter "Stockton") at the Wake County Detention Center ("WCDC") on November 6, 2011. Compl. [D.E. 1-2] ¶¶ 61-117. Presently, there are four pending motions for summary judgment filed by different sub-groups of defendants.[1] Mots. Summ. J. [D.E. 102, 104, 107, 109]. Plaintiff files responses in opposition to the motions [D.E. 116–119] and defendants filed replies [D.E. 132–136]. Additionally, on March 11, 2016, attorney Andrew Buckner filed an unopposed motion to withdraw as counsel for Dr. Umesi [D.E. 137]. As explained below, the court grants Wake County's motion for summary judgment solely

[1]The sub-groups are as follows: 1) Wake County; 2) Sheriff Donnie Harrison, WCDC Director Dail Butler, and Officers Brown, Bayes, and Sabas as well as the Sheriff's surety, Ohio Casualty Insurance Company; 3) WCDC Medical Director Dr. Obinnaya C. Umesi; and, 4) WCDC Nurses Hester and Anumudu.

as to count five of the complaint and Buckner's motion to withdraw, and denies the remaining motions.

## Factual Allegations[2]

On November 5, 2011, at 1:00 p.m., Stockton and a friend entered Bagwell's C-stop convenience store in Raleigh. Compl. [D.E. 1-2] ¶ 21. The store clerk (a volunteer firefighter) observed that the two were impaired and called the Wake County Sheriff's Office to report a possible drunk driver. Id. Deputy Bruner (not a defendant) responded, pulled over Stockton's car after he left the store, and observed him to be nervous and shaking. Id. at ¶ 22. Stockton reported that he had a prescription pill problem that required methadone treatment.[3] Id.

While Bruner returned to his patrol car, it is alleged that Stockton ingested a "myriad of medications contained in a thermos bottle." Id. at ¶ 23. The deputy discovered that Stockton had an outstanding arrest warrant for underage drinking, asked to search the vehicle, and found a small quantity of marijuana. Id. Stockton took responsibility for the marijuana. Id.

Because of the store clerk's observations and his own, Deputy Bruner administered an alcosenser test which registered .00. Id. at ¶ 24. A citation for possession of marijuana was issued, and due to the outstanding warrant, Stockton was arrested by Deputy Walker, who had now arrived at the scene. Id. at ¶ 25. Deputy Walker transported Stockton to the WCDC. Id. While in transport to WCDC (about ten minutes away), Stockton fell asleep several times.[4] Id.

---

[2] In support of their motions for summary judgment, defendants "submit[ted] [a] statement of undisputed facts, which all Defendants incorporate and rely upon in their respective motions for summary judgment." Mem. Supp. Wake Cty. Mot. Summ. J., p. 3. "Plaintiff strongly disagrees with the assertion that the facts stipulated by all defendants are undisputed; many of them are disputed by Plaintiff." Pl. Resp. Opp'n Sheriff Defts.' Mot. Summ. J., p. 3. Thus, at this stage in the litigation the court does not accept defendants' statement of facts. See Scott v. Harris, 550 U.S. 372, 378 (2007) (in considering summary judgment, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party). Instead, the court recites the facts as set out in its August 19, 2014 order, which are the facts as set out in the complaint and alleged by plaintiff.

[3] Both Deputy Bruner and Deputy Walker heard Stockton describe his prescription pill problem and daily attendance at a Methadone clinic. Bell Report p. 89; Walker Dep. p. 62.

[4] During Stockton's time with Deputy Walker, Stockton demonstrated several signs and symptoms of impairment including slow speech, slow movement, shaking, and wide open eyes

At approximately 3:00 p.m., Stockton arrived at WCDC and was checked in by . . . Officer Coley and Nurse Fitz, both of whom, it is alleged, should have recognized his impairment. Id. at ¶ 26-27. No further medical attention was rendered at this time, and Stockton was placed into a holding cell. Id. at ¶ 27-28. During the period of time in the holding cell and throughout the evening, Stockton displayed abnormal and erratic behavior. Id. at ¶ 28. Due to Stockton's behavior, Officer Coley moved Stockton into a private cell. Id. at ¶ 29. There, Stockton continued to display erratic behavior such as continuously summoning Coley and . . . Officer Santelli and asking for instruction to operate the phone and asking to call his deceased father. Id.

Officer Santelli informed his supervisor, . . . Sergeant Williams, that something was wrong with Stockton; Williams specifically instructed Santelli to do nothing; and, Santelli did nothing. Id. at ¶ 30. Officer Santelli did not personally report the observations to medical staff nor did he seek medical care for Stockton after such instruction. Id.

At 10:00 p.m., after being asked to check on Stockton due to his continued erratic behavior, defendant Nurses Anumudu and Hester observed Stockton through the glass, but neither nurse allegedly did anything more.[5] Id. at ¶ 31.

In the holding cell, Stockton's behavior is alleged to have become increasingly erratic and confused. Id. at ¶ 32. Stockton attempted to place a call 16 times, 15 of which were to his mother; however, when his mother would attempt to accept the calls she was immediately disconnected. Id. At the same time, Stockton's mother made multiple calls to the WCDC.[6] Id. at ¶ 33. She spoke to at least one nurse and one officer, defendant Officer Brown, explaining her son's history of drug use, that he was on a multitude of drugs, and that he required careful monitoring. Id.

---

and pupils. Bell Report p. 91; Walker Dep. pp. 64, 80-84.

[5] If a detention officer expressed concerns to a nurse about an inmate in the general housing pods, the nurse was required to assess the inmate. Fitz Dep. p. 54. Several detention officers told Nurses Anumudu and Hester that Stockton needed to be assessed. Williams Dep. pp. 20–21, 24, 30–31; Lowery Dep. p. 104.

[6] WCDC policy required a detention officer was to report to the nursing staff if a family member called the WCDC with concerns related to drug use by a family member who was in the WCDC and with requests that they be monitored closely. Fitz Dep. p. 41; Harrison Dep. p. 77. The policy also required any nurse who received such information to assess the inmate. Fitz Dep. pp. 41–41.

At 10:15 p.m., Stockton was taken for a strip search and "dress out procedures," wherein . . . Officers Lowery and Mimms found him "spaced out" and "panicked." Id. at ¶ 34. At approximately the same time, . . . Sergeant Ransome observed Stockton and incorrectly identified Stockton as being intoxicated by alcohol. Id. Officer Lowery informed a nurse, alleged to be Nurse Anumudu, of Stockton's heroin use, and Officer Lowery requested that Stockton be medically screened. Id. The nurse told Officer Lowery that Stockton would be placed on the first floor for observation. Id. This was not done. No drug screen was performed and Stockton was not placed into an observation cell. Id. Stockton was placed into an overcrowded general population pod. Id.

At 11:30 p.m., Stockton was staggering and speaking incoherently. Id. at ¶ 35. Nine minutes later, at approximately 11:39 p.m., it is alleged that Nurse Anumudu medically screened Stockton. Id. She conducted the screening in less then three minutes. Id. Nurse Anumudu did not attempt to identify the intoxicating agents. Id. Stockton reported to Nurse Anumudu that he had been taking methadone. Id. On the Medical Screening Form, Nurse Anumudu noted "Heroin Protocol." Id. On the Mental Health Screen form, Nurse Anumudu checked "yes" to the question "have you ever been in a hospital for emotional or mental health problems." Id. Nurse Anumudu also referred Stockton to "psychologist/medical," but this was not done.[7] Id.

At 11:42 p.m., Stockton was placed in cell 1BO5. Id. ¶ 36. At 12:17 a.m., defendant Officer McClain escorted Stockton to "the Green Pod." Id. Stockton could not control his movements appropriately, "was not moving very well, " and Officer McClain had to help Stockton into the pod. Id. Stockton could hardly talk and did not know his name. Id. He appeared intoxicated and pale. Id. He was sweating, and he had difficulty breathing.[8] Id.

Stockton was placed into a general population cell where several inmates observed Stockton's behavior and characterized him as "messed up," "high," and not breathing well when placed into the cell. Id. ¶ 37. Inmates were heard to state

---

[7]The only video of this screening shows Stockton walking to the nurse's station at 11:39:45 p.m. for about fifteen (15) seconds and from the nurse's station at 11:42:00 for about fifteen (15) seconds, a period of less than three (3) minutes. It now appears that there was additional video that was not preserved. Steinbeck Aff. ¶¶ 7-11, D.E. 95.

[8]After the medical screening, Stockton fell asleep on a bench and was difficult to wake. Ransome Dep. p. 20; McClain Dep. pp. 76, 139–40. Sergeant Ransome shook Stockton to wake him. Id. Stockton was moving very slowly and not breathing well. Ransome Dep. p. 140; Bell Report p. 35. Stockton could barely walk and was nodding off while standing up as he was taken to the Green Pod. Bell Report p. 41.

they thought Stockton was dying, and he sounded like he was choking. Id. Inmates informed detention staff that they believed Stockton needed medical attention. Id.

Stockton is alleged to have informed inmate Michael Wiles that he had ingested over forty prescription pills during the traffic stop. Id. ¶ 38. In turn, Wiles informed Officer McClain on at least three occasions that Stockton ingested a large quantity of pills, needed his stomach pumped, and required medical attention. Id. Officer McClain is alleged to have responded that Stockton was a junkie and was sleeping off his high. Id.

At 6:31 a.m., over fifteen hours after Stockton's arrival at WCDC, Officer McClain checked on Stockton as he lay on the floor of the overcrowded pod. Id. ¶ 39. No pulse was found, but he was warm to the touch. Id. At 6:40 a.m., 911 was called and at 6:47 a.m. EMC arrived. Id. At 7:14 a.m., on November 6, 2011, Stockton was pronounced dead. Id.

On November 7, 2011, Clay Nichols, M.D. ("Dr. Nichols") with the Office of the Chief Medical Examiner performed Stockton's autopsy. Id. ¶ 47. No significant anatomic finding was identified to account for Stockton's death. Id. An analysis of Stockton's blood showed that multiple drug levels were present including amphetamine, methadone, and benzodiazepines. Id. Dr. Nichols' concluded that Stockton died as the result of the combined toxic effects of multiple medications. Id.

The supervisory requirements for jails in North Carolina are set forth in 10A N.C.A.C. 14J.0601, and require, at a minimum, the direct observation of each inmate in person at least twice an hour, and a heightened requirement of four times an hour for an inmate who is intoxicated, or displaying erratic behavior, or who has a previous record of mental illness. 10A N.C.A.C. 14J.0601. Plaintiff contends that WCDC employees violated this policy in three ways. Firs[t], she asserts that from 12:43 a.m. to 6:31 a.m., the inmates in Green Pod were directly observed eleven times for a total of fifteen minutes in direct contravention of the minimum policy. Compl. ¶ 42. The longest supervisory round of observation was only three minutes. Id. These rounds were performed by defendants Officer Sabas and Officer Bayes. Id. Second, plaintiff contends that given Stockton's behavior and his known prior mental health record, he should have been placed into an observation cell and directly observed at least four times per hour as required by the policy for one who is intoxicated, or displaying erratic behavior, or who has a previous record of mental illness. Id. ¶ 43. Third, plaintiff contends that Stockton's death could have been avoided by the provision of basic medical attention and administration of well known and effective medication designed to promptly reverse the depressant effects of narcotic drugs. Id. ¶ 52. All defendants were aware of the potential deadly complications of overdose from opioids and

> barbiturates and knew that an antidote medication was readily available to counter the effects of these drugs. Id. ¶¶ 25, 30-31, 34-35.
>
> Plaintiff further alleges that Stockton's death is not the first time an inmate or detainee in the care, custody, and safekeeping of Sheriff Harrison, and his agents, employees, nurses, and/or officers assigned to the WCDC, has been injured or died at the WCDC as a result of failure to properly monitor and supervise inmates and detainees; failure by Sheriff Harrison and others to properly supervise and train the agents, employees, nurses, and/or officers assigned to the WCDC; the failure to comply with North Carolina statutes and/or administrative codes; and/or the failure to secure adequate and emergency medical care to inmates. Id. ¶ 54. Plaintiff describes five such deaths occurring at the WCDC in the 18 months preceding Stockton's death. Id. ¶¶ 55-60.

8/19/14 Order, pp. 2–7. Other evidence is also now in the record and before the court including depositions, interrogatories, reports, records, expert testimony, and audio and video recordings.[9] This evidence will be discussed and expounded where relevant below.

## Discussion

Plaintiff's complaint asserts seven remaining[10] claims: (1) violations of 42 U.S.C. §§ 1983 and 1988 by detention officers Williams, Coley, Brown, McClain, Bayes, Sabas, and Nurse Anumudu, Compl. ¶¶ 61- 67 (count one); (2) violations of 42 U.S.C. §§ 1983 and 1988 by Sheriff Harrison, Director Butler, and Dr. Umesi in their individual and official capacities, id. ¶¶

---

[9]There is an audio recording of Stockton placing a call to a bail bondsman, as well as several jail videos. As pointed out by the parties, the videos do not contain audio and have periods of time missing. First Aff. Steinbeck, Ex. A–F, [D.E. 95]; Notice, [D.E. 129].

[10]On May 6, 2014, plaintiff filed a partial stipulation of voluntary dismissal [D.E. 74], dismissing without prejudice counts one and six and her request for punitive damages against defendants Walker, Ransome, Lowery, Santelli, Mimms, Fitz, and Hester. On August 11, 2015, plaintiff and defendants filed another stipulation of voluntary dismissal [D.E. 99, 100], dismissing without prejudice all claims against defendants Walker, Ransome, Lowery, Santelli, Mimms, Coley, Fitz, and Williams. On August 18, 2014, the court dismissed count six of the complaint, as well as any associated request for punitive damages, against defendants Anumudu and Umesi. 8/19/14 Order, pp. 15–16. The court also dismissed punitive damages against Wake County in connection with count three. Id., p. 20.

68-78 (count two); (3) violations of 42 U.S.C. §§ 1983 and 1988 by Wake County, id. ¶¶ 79-83 (count three); (4) state-law wrongful death against detention officers Brown, McClain, Sabas, and Bayes and nursing defendants Anumudu and Hester in their individual capacities, id. ¶¶ 84–93 (count four); (5) state-law wrongful death against Wake County, Sheriff Harrison, WCDC Director Butler, and Dr. Umesi in their individual and official capacities, id. ¶¶ 94–99 (count five); (6) state-law claim of injury to a prisoner pursuant to N.C. Gen. Stat. § 162–55 against Sheriff Harrison, Director Butler, and the detention defendants Brown, Bayes, and Sabas, id. ¶¶ 100-107 (count six); and (7) action on bonds and N.C. Gen. Stat. § 58-76-1, et seq. as to Sheriff Harrison and Surety, id. ¶¶ 108–110 (count seven).

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007). "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." Anderson, 477 at 249–50 (internal citations omitted).

I. Motion for Summary Judgment by Wake County: Count Three (42 U.S.C. §§ 1983 and 1988)[11]

Wake County seeks summary judgment on count three based on plaintiff's allegation that Wake County is responsible for any alleged action or omission of the Sheriff, his deputies or his jailors and that Wake County was responsible for an "inadequate" medical plan. Wake County contends that the "law in North Carolina recognizes no such claim of vicarious responsibility between a County and a Sheriff and more importantly, plaintiff's forecast of evidence reveals no genuine issue of material fact with respect to the adequacy of the medical plan and proximate cause such that Wake County is entitled to judgment as a matter of law on plaintiff's claims under 42 U.S.C. § 1983." Mem. Supp. Wake Cty. Mot. Summ. J., p. 12.

The doctrine of respondeat superior generally does not apply to a section 1983 action. See, e.g., Iqbal, 556 U.S. at 676–77; Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978); Carter v. Morris, 164 F.3d 215, 218, 220–21 (4th Cir. 1999); Shaw v. Stroud, 13 F.3d 791, 798–99 (4th Cir. 1994). Alleging that a county or municipal employee committed a constitutional violation is necessary, but not sufficient, to state a claim against a county or municipality. A county or municipality may be found liable under 42 U.S.C. § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U.S.

[11] Wake County also seeks summary judgment on count five of the complaint, which plaintiff does not contest. Pl. Resp. Opp'n Wake Cty.'s Mot. Summ. J., p. 6, Section II. Thus, the court grants summary judgment to Wake County on count five and focuses its analysis solely on count three of the complaint.

at 694; see Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003). Therefore, a county or municipality may not be found liable under section 1983 based on a theory of respondeat superior or simply for employing a tortfeasor. See, e.g., Connick v. Thompson, 563 U.S. 51, 60–64 (2011); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403–04 (1997). Furthermore, for section 1983 liability to extend to a local government, the government's policy or custom must be the "moving force" that resulted in the constitutional violation. Monell, 436 U.S. at 694; see also Brown, 520 U.S. at 404 ("As our § 1983 municipal liability jurisprudence illustrates . . . it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to [a] municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.").

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

Lytle, 326 F.3d at 471 (internal citations omitted).

Plaintiff contends that Wake County was, at all relevant times, responsible for the formulation and execution of policies regarding the provision of medical care to inmates and detainees in the WCDC. Wake County, plaintiff alleges, has de facto policies, practices and customs which caused harm to Stockton including: a) the failure to implement proper plans, policies and/or procedures necessary to see that inmates and detainees are provided appropriate, necessary and adequate medical care and protection from emergency and perilous medical conditions; b) the failure to draft and/or institute proper plans, policies and/or procedures

designed to protect the health and welfare of inmates and detainees of the WCDC; c) the failure to draft and/or institute proper plans, policies and/or procedures regarding medical supervision of inmates and detainees of the WCDC; d) the failure to draft and/or institute proper plans, policies and/or procedures regarding emergency medical care for inmates and detainees at the WCDC to the extent necessary for their health and welfare; e) if such policies/procedures exist, in failing to see that such policies and procedures were followed; f) the failure to implement proper and reasonable policies and procedures regarding the evaluation, monitoring, supervision, observation, and housing of inmates and detainees in the WCDC in need of medical care including, and especially inmates and detainees who are intoxicated, are displaying erratic behavior, have a previous history of mental illness, and/or have serious medical conditions; and g) other policies, customs and practices to be identified during the course of discovery and/or trial. Compl. [D.E. 1-2] ¶ 81; Pl. Resp. Opp'n Wake Cty. Mot. Summ. J., pp. 3–4.

As the court held previously in denying Wake County's motion to dismiss, "[a] county may only be held liable for acts for which the county has final policymaking authority." Parker v. Bladen Cnty, 583 F. Supp. 2d 736, 739 (E.D.N.C. 2008); see Little v. Smith, 114 F. Supp. 2d 437, 446 (W.D.N.C. 2000). State law governs whether a county has final policymaking authority on a specific topic. See, e.g., City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988); Parker, 583 F. Supp. 2d at 739.

"Under North Carolina law, sheriffs have substantial independence from county government." Parker, 583 F. Supp. 2d at 739. Under the North Carolina Constitution, voters directly elect the sheriff. See N.C. Const. art. VII, § 2. County governments do not hire sheriffs. See, e.g., Parker, 583 F. Supp. 2d at 739; Little, 114 F. Supp. 2d at 446. By statute, "the sheriff,

not the county encompassing his jurisdiction, has final policymaking authority over hiring, supervising, and discharging personnel in the sheriff's office." Parker, 583 F. Supp. 2d at 739; see N.C. Gen.Stat. § 153A–103(1); Clark v. Burke Cty., 117 N.C. App. 85, 89, 450 S.E.2d 747, 749 (1994). However, North Carolina law vests the sheriff with the "statutory responsibility for the care and custody of the inmates at the county jail." Jones v. Harrison, 4:12-CV-90-D, 2013 WL 1452861, at *2 (E.D.N.C. Apr. 9, 2013); Vaught v. Ingram, No. 5:10–CT–3009–FL, 2011 WL 761482, at *4 (E.D.N.C. Feb. 24, 2011) (unpublished); see N.C. Gen.Stat. § 162–22; Landry v. North Carolina, No. 3:10–cv–585–RJC–DCK, 2011 WL 3682788, at *2 (W.D.N.C. Aug. 23, 2011) (unpublished).

By statute, each county that operates a jail "shall develop a plan for providing medical care for prisoners in the facility." N.C. Gen. Stat. § 153A–225(a). The plan is to be designed to protect the health and welfare of the prisoners and provide for medical supervision of prisoners and emergency medical care for prisoners to the extent necessary for their health and welfare. Id. The county develops the medical care plan in conjunction with local authorities, including the sheriff, the county physician, and the local district health director. Id.

Wake County argues that "[p]laintiff attempts to conflate the separate statutory responsibilities of the Office of Sheriff and the County." Mem. in Supp. Summ. J., D.E. 103, at 18. Wake County contends that under North Carolina law, "the sheriff has exclusive custody and control of the jail in his county," and thus Wake County can have no vicarious liability for the Sheriff or his employees. Id. Further, Wake County argues that "[c]ounties do not provide 'medical services' to inmates in North Carolina. However, counties do build jails and put them in to operation, including putting into place a medical plan for treatment of inmates." Id. The

North Carolina Court of Appeals, however, has construed the statute more expansively to "'require that a county provide emergency medical services to prisoners incarcerated in the county's jail and to pay for such services.'" Cty. of Guilford v. Nat'l Union Fire Ins. Co., 108 N.C. App. 1, 4, 422 S.E.2d 360, 362–63 (1992) (quoting Univ. of N.C. v. Hill, 96 N.C. App. 673, 675, 386 S.E.2d 755, 757, aff'd, 327 N.C. 465, 396 S.E.2d 323 (1990)) (emphasis omitted).

Furthermore, as aptly stated by plaintiff, Wake County's argument itself creates a genuine issue of material fact for trial. Wake County argues that 1) plaintiff's evidence is insufficient on the question of whether the Jail Medical Plan was deficient, and 2) plaintiff's expert, Amy Crittenden, RN, is not qualified to offer her opinions regarding the Jail Medical Plan. Crittenden testified in her deposition that "the focus of the Receiving and Screening Policy is on alcohol withdrawal, which in only one facet of substance abuse" and that "the policy is not sufficiently specific on how often inmates should be monitored as opposed to inmates who are suicidal." The plan instructs that detainees at risk of suicide are to be observed every 15 minutes and inmates at risk of delirium tremors due to alcohol withdrawal shall be monitored closely by medical staff. However, there is no directive under the plan relating to supervision of mentally ill inmates or those detainees significantly impaired by drugs other than alcohol.

Stockton had a documented history of mental illness evidenced by Nurse Anumudu's entry on the medical screening form and by his treatment for opioid addiction. There is also substantial evidence before the court that Stockton was experiencing a serious and escalating medical condition due to his impairment by drugs. 8/19/14 Order, pp. 12–13. It is a question of material fact as to whether jail staff failed to provide Stockton with close or heightened observation as the result of a deficient plan. Whether Wake County breached its duty to provide

emergency medical services and to develop an adequate medical care plan to provide medical services and whether such breach is the proximate cause of Stockton's death are indeed questions of material fact. Cf. Olds v. United States, 473 F. App'x 183, 185 (4th Cir. 2012) (per curiam) (unpublished) ("Proximate cause is an inference of fact to be drawn from other facts and circumstances. Only when the facts are all admitted and only one inference may be drawn from them will the court declare whether an act was the proximate cause of an injury or not."). Thus, the court denies Wake County's motion for summary judgment as to count three of the complaint. See Vaught, 2011 WL 761482, at *3–4; Ellis v. Bunn, No. 7:08–CV–71–BR, 2008 WL 3876165, at *2–3 (E.D.N.C. Aug. 18, 2008) (unpublished).

II. Motion for Summary Judgment by Dr. Umesi

1. Count Two (42 U.S.C. §§ 1983 and 1988)

Plaintiff's claim against Dr. Umesi is premised on supervisory liability. Section 1983 claims against supervisors are cognizable when liability is not premised upon respondeat superior but upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). To establish supervisory liability under section 1983, a plaintiff must establish three things:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices . . ."; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw, 13 F.3d at 799; see Iqbal, 556 U.S. at 677; Rizzo v. Goode, 423 U.S. 362, 371 (1976); Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001). The subordinate's conduct must be "pervasive," meaning that "the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." Shaw, 13 F.3d at 799 (quotation omitted). Although

> a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct[,] [a] supervisor's continued inaction in the face of documented widespread abuses . . . provides an independent basis for finding [that the supervisor] either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

Slakan, 737 F.2d at 373; see Randall v. Prince George's Cty., Md., 302 F.3d 188, 206 (4th Cir. 2002).

Dr. Umesi is a physician duly licensed under the laws of the State of North Carolina, the Medical Director (also referred to as the designated Health Authority) of the WCDC, and an agent and employee of Wake County and/or Sheriff Harrison at the time of the alleged events. Compl. [D.E.1-2] ¶ 5. As the director, he is charged with supervision of the nurses at WCDC including, but not limited to, defendant Anumudu. Id. One of his roles as the director is to assist in developing the Plan required by North Carolina statute which is approved and adopted annually by the Sheriff and Wake County. Umesi Dep. pp. 15, 21–23 & Ex. 18. Dr. Umesi also provided clinical treatment to inmates at the jail, but he was not present (and that is not contested) for the events at issue. Id. at 81.

There are genuine issues of material fact concerning the sufficiency of Dr. Umesi's established medical protocols, policies, and procedures; the manner in which he trained, or failed to train, the nurses, including Nurses Anumudu and Hester; and whether any such failure(s) were

a proximate cause of Stockton's death. Compare, Umesi Dep. pp. 42, 53–54, 56, 62, 76–77, 84–85,107, 109, 152–53, 220–21, 256, Ex. 18 (protocol) with Anumudu Dep. pp. 60, 93, 101, 103, 142; Hester Dep. pp. 52-53; Fitz Dep. p. 38; 10 N.C.A.C. 14J.0601. Thus, the court denies Dr. Umesi's motion for summary judgment.

Alternatively, Dr. Umesi asserts the defense of qualified immunity. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Mullenix v. Luna, 136 S. Ct. 305, 308 (2015); Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (per curiam); City & Cty. of San Francisco v. Sheehan, 135 S. Ct. 1765, 1774 (2015); Carroll v. Carman, 135 S. Ct. 348, 350 (2014) (per curiam); Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Mullenix, 136 S. Ct. at 308; Taylor, 135 S. Ct. at 2044; Sheehan, 135 S. Ct. at 1774; Carroll, 135 S. Ct. at 350.

The court asks two questions to determine whether qualified immunity applies. See, e.g., Reichle, 132 S. Ct. at 2093; Pearson v. Callahan, 555 U.S. 223, 232 (2009); Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). Courts have discretion about which question to address first. Pearson, 555 U.S. at 236. The court must determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Id. at 232. The court also must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged

misconduct." Id. "A Government official"s conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (alterations and quotations omitted). The United States Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Id.; see Reichle, 132 S. Ct. at 2093. Thus, Dr. Umesi is entitled to summary judgment on qualified immunity grounds if the answer to either question is "no." See, e.g., Reichle, 132 S. Ct. at 2093; al-Kidd, 131 S. Ct. at 2080; Miller v. Prince George's Cty., 475 F.3d 621, 627 (4th Cir. 2007); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 606 (E.D.N.C. 2009).

Having concluded that plaintiff has successfully alleged violations of clearly established constitutional rights through supervisory liability, the court likewise concludes that Dr. Umesi is not entitled to qualified immunity on the current record.

2. Count Five (wrongful death)

Dr. Umesi next asserts that he is entitled to summary judgment on the wrongful death claim for three reasons: 1) plaintiff failed to produce any evidence establishing that Stockton died as a result of any act or omission by Dr. Umesi; 2) plaintiff failed to comply with the requirements of Rule 9(j); and 3) governmental or sovereign immunity bars this claim in both Dr. Umesi's official and individual capacity.

i. Failure to produce evidence

Dr. Umesi asserts in this summary judgment motion that there is an insufficient forecast of evidence to support a claim that he breached the standard of care in violation of N.C.G.S. §

90-21.11, et seq. As set out above, there is a genuine issue of material fact as to whether Dr. Umesi breached the standard of care for his responsibilities as the medical director of the Jail to the detainees, including Stockton. This is evidenced by the manner in which he established jail medical protocols and the manner in which he trained, or failed to train, Nurses Anumudu and Hester in following the protocols. Compare, Umesi Dep. pp. 42, 53-54, 56, 62, 76-77, 84–85,107, 109, 152-153, 220–21, 256, Ex. 18 (protocol) with Anumudu Dep. pp. 60, 93, 101, 103, 142; Hester Dep. pp. 52-53; Fitz Dep. p. 38; 10 N.C.A.C. 14J.0601. Moreover, there is a genuine issue of material fact as to whether any failure by Dr. Umesi to properly train the nurses in the Jail and to establish written policy, procedures, and specific protocols was a proximate cause of Stockton's death. Id.

ii. Rule 9(j)

In North Carolina, there are substantive legal requirements that a person must follow to pursue a medical malpractice claim. In North Carolina, a plaintiff asserting negligence must prove the existence of a legal duty or standard of care owed to the plaintiff by the defendant, breach of that duty, a causal relationship between the breach of duty and the plaintiff's alleged injuries, and certain actual injury or loss sustained by the plaintiff. Camalier v. Jeffries, 340 N.C. 699, 706, 460 S.E.2d 133, 36 (1995); Blackwell v. Hatley, 202 N.C. App. 208, 212, 688 S.E.2d 742, 746 (N.C. Ct. App. 2010).

North Carolina Rule of Civil Procedure 9(j) states in relevant part:

> Any complaint alleging medical malpractice by a health care provider as defined in [N.C. Gen. Stat. §] 90-21.11 in failing to comply with the applicable standard of care under [N.C. Gen. Stat. § ] 90-21.12 shall be dismissed unless:
>
> > (1) The pleading specifically asserts that the medical care has been reviewed by a person who is reasonably expected to qualify as an

> expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care;
> (2) The pleading specifically asserts that the medical care has been reviewed by a person that the complainant will seek to have qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care, and the motion is filed with the complaint; or
> (3) The pleading alleges facts establishing negligence under the existing common-law doctrine of res ipsa loquitur.

N.C. R. Civ. P. 9(j).

Failure to comply with Rule 9(j) is ground for dismissal of a state medical-malpractice claim filed in federal court. See, e.g., Estate of Williams-Moore v. Alliance One Receivables Mgmt. Inc., 335 F. Supp. 2d 636, 649 (M.D.N.C. 2004); Frazier v. Angel Med. Ctr., 308 F. Supp. 2d 671, 676-77 (W.D.N.C. 2004); Moore v. Pitt County Mem'l Hosp., 139 F. Supp. 2d 712, 713-14 (E.D.N.C. 2001); see also Thigpen v. NGO, 355 N.C. 198, 202, 558 S.E.2d 162, 165 (2002). Section 90-21.11 of the North Carolina General Statutes defines a "[m]edical malpractice action" as "[a] civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care provider." N.C. Gen. Stat. 90-21.11(2)(a).

However, there are claims against health care providers which do not fit within the statutory definition of medical malpractice. These claims have been found not to involve the "furnishing or failure to furnish professional services" which the North Carolina Court of Appeals has defined as "arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor [or] skill involved is predominantly mental or intellectual, rather than physical or manual." See, e.g., Lewis v. Setty, 130 N.C. App. 606,

608, 503 S.E.2d 673, 674 (1998) (removing a patient from a table is not a "professional medical service"); Taylor v. Vencor, Inc., 136 N.C. App. 528, 525 S.E.2d 201 (2000) (failure to supervise a mentally and physically infirm patient while she smoked was ordinary negligence). Similarly, many claims against health care providers do not fit within the statutory definition of medical malpractice because they do not arise out of the "performance of medical, dental, or other health care." These types of claims arise out of policy, management, or administrative decisions and instead are derived from ordinary negligence principles. See, e.g., Estate of Waters v. Jarman, 144 N.C. App. 98, 101–03, 547 S.E.2d 142, 144–45 (2001) (finding claims that a hospital[12] failed to follow policies and to appropriately monitor and oversee employees sounded in ordinary negligence); Allen v. Cty. of Granville, 203 N.C. App. 365, 366–68, 691 S.E.2d 124, 126–27 (2010) (finding that a hospital's failure to supervise a patient recently treated with seizures was ordinary and not medical negligence).

The court finds that plaintiff's claims against Dr. Umesi sound in ordinary negligence because the claims allege administrative and ministerial failings and do not arise from his personal furnishing or failure to furnish professional services.[13] See, e.g., Waters, 144 N.C. App. at 101–03, 547 S.E.2d at 144–45; Allen, 203 N.C. App. at 366–38, 691 S.E.2d at 126–27.

iii. Immunity

Dr. Umesi contends that his insurance policy (Medical Protective Company) does not provide coverage for ordinary negligence claims against him and thus he is shielded by

[12]Pursuant to N.C. Gen. Stat. § 90–21.11, a hospital constitutes a "health care provider."

[13]While not dispositive of the issue, the court notes that plaintiff specifically pled a claim of ordinary negligence against Dr. Umesi in the complaint. Compl. ¶ 5.

governmental or sovereign immunity. However, where there is any ambiguity in the terms of an insurance policy the court should adopt the construction most favorable to the insured. Leland v. Federal Ins. Adm'r, 934 F.2d 524, 529 (4th Cir. 1991). Moreover, plaintiff points to a second insurance policy with the Evanston Insurance Company. Pl. Resp. Opp'n Umesi Mot. Summ. J., p. 22 & Ex. 2.

The Evanston Insurance Company Policy produced in discovery by counsel for the nursing defendants appears to cover Dr. Umesi in listing the "Wake County Sheriff's Infirmary" as the named insured and including "[a]ny medical director solely while acting on behalf of the Named Insured and solely within the scope of his/her Administrative Duties" among the individuals listed as an insured party. Pl. Resp. Opp'n Umesi Mot. Summ. J., Ex. 2 [D.E. 127-2] 9, 14. It is undisputed that Dr. Umesi was the Medical Director of the WCDC. Further, plaintiff's claims have been found to pertain to Dr. Umesi's administrative duties defined in the Evanston policy as "establishing medical protocol." This language illustrates that plaintiff's claims against Dr. Umesi for ordinary negligence arising out of his administrative duties as Medical Director are proper. Thus, the court declines to award summary judgment on plaintiff's wrongful death claim against Dr. Umesi in his official capacity.

Dr. Umesi further asserts that he is entitled to public officer immunity.[14] Under state law, public officers sued in their individual capacity are entitled to immunity for their conduct unless such conduct was malicious, corrupt, or outside the scope of their duties. Meyer v. Walls, 34 N.C. 97, 112–13, 489 S.E.2d 880, 888–89 (1997); see Petersen v. Midgett, No. 2:12-CV-60-D,

---

[14] "Plaintiff acknowledges that Dr. Umesi may be a public official rather than a public employee." Pl. Resp. Opp'n Umesi Mot. Summ. J. 23. Thus, the court assumes without deciding that Dr. Umesi is a public officer.

__ F. Supp. 3d __, 2015 WL 5684722, at *10 (E.D.N.C. Sept. 25, 2015). The court finds that material issues of fact preclude a determination on summary judgment as to whether Dr. Umesi's actions and omissions were willful and wanton. See, e.g., Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013). Thus, the court declines to find that Dr. Umesi is entitled to public officer immunity on the current record.

Lastly as stated above, punitive damages are available where negligence is accompanied by an aggravating factor such as fraud, malice, or willful and wanton conduct. See N.C. Gen. Stat. § 1D–15(a). For the same reasons set forth above, the court finds that plaintiff has set forth sufficient allegations coupled with supporting evidence to sustain a punitive damages claim as to Dr. Umesi.

## III. Motion for Summary Judgment by Nurse Anumudu and Nurse Hester

### A. Count One (42 U.S.C. §§ 1983 and 1988)[15]

Count one of plaintiff's complaint, which remains only as to Nurse Anumudu, asserts that Anumudu provided constitutionally deficient medical care to Stockton. "To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Additionally, a section 1983 plaintiff must

---

[15]"The Civil Rights Attorney's Fees Awards Act of 1976 authorizes the award of 'a reasonable attorney's fee' to 'the prevailing party' in certain civil rights actions, including suits brought under Section 1983." Lefemine v. Wideman, 758 F.3d 551, 555 (4th Cir. 2014) (citing 42 U.S.C. § 1988(b)). "The purpose of [Section] 1988 is to ensure effective access to the judicial process for persons with civil rights grievances." Id. (quoting Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (quotation marks and citation omitted).

allege the personal involvement of a defendant. See, e.g., Iqbal, 556 U.S. at 676; Monell, 436 U.S. at 691–92 (1978); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).

Courts evaluate confinement conditions of pretrial detainees under the due process clause of the Fourteenth Amendment, rather than under the Eighth Amendment. See, e.g., Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979). As a practical matter, the analysis under the due process clause and the analysis under the Eighth Amendment is materially indistinguishable. See, e.g., Riley v. Dorton, 115 F.3d 1159, 1166–67 (4th Cir. 1997) (en banc), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam); Hill v. Nicodemus, 979 F.2d 987, 991–92 (4th Cir. 1992).

"Pretrial detainees, like inmates under active sentence, are entitled to medical attention, and prison officials violate detainee[s'] rights to due process when they are deliberately indifferent to serious medical needs." Nicodemus, 979 F.2d at 991 (quotation omitted). To prove such a claim, a plaintiff must demonstrate that the defendant "acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). Deliberate indifference requires that an official actually know of and disregard an objectively serious condition, medical need, or risk of harm. See id. at 837; Iko, 535 F.3d at 241. Plaintiff must demonstrate that the care provided to Stockton was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990); Hicks v. James, 255 F. App'x 744, 749 (4th Cir. 2007) (per curiam) (unpublished). Only when an action meets both the objective and subjective elements will it offend the "evolving standards of decency" in such a way as to violate the

constitutional prohibition against "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104–06; Farmer v. Brennan, 511 U.S. 835-836 (1994). Mere negligence or malpractice in diagnosis or treatment does not state a constitutional claim. See Estelle, 429 U.S. at 105–06; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999).

Nurse Anumudu seeks summary judgment for the same reasons she initially moved to dismiss plaintiff's claims against her: first, she contends that plaintiff cannot meet the objective serious medical condition prong; and, second, that plaintiff has not alleged that Nurse Anumudu subjectively acted with deliberate indifference. Turning to the objective prong inquiry, Nurse Anumudu argues that plaintiff has failed to allege the existence of a sufficiently serious medical need when, "[a]cross the country, it has been determined that a 'detainee's generalized state of intoxication, without more, is insufficient to establish a serious medical need[.]'" Mem. Supp. Nurses' Mot. Summ. J., p. 12 (quoting Border v. Trumball Cty. Bd. of Comm'rs, 414 Fed. App'x 831 (6th Cir. 2011) (unpublished)); see Mem. Supp. Nurses' Mot. Dism. [D.E. 46] 9. Specifically, defendant Anumudu again relies on the Fourth Circuit's holding in Grayson, where an intoxicated, belligerent, irrational, and slurring detainee did not establish a sufficiently objective serious medical need. Grayson, 195 F.3d at 694.

The court denies Nurse Anumudu's motion for summary judgment on count one for substantially the same reasons that it denied her motion to dismiss.[16] Moreover, although the court previously distinguished the Fourth Circuit's holding in Grayson based on the procedural

[16] The court further notes that this defendant again does not assert the defense of qualified immunity. Cf. Parrish ex rel. Lee v. Cleveland, 372 F.3d 294 (4th Cir. 2004).

posture of that case (a motion for summary judgment), the court concludes that this case remains fully distinguishable from Grayson.

> The facts of Grayson were that upon the officers' arrival at the scene, the detainee was found to be "acting crazy." Id. After searching the detainee, the officers discovered a canister containing marijuana and a canister containing a substance believed to be PCP. Id. One of the officers placed the detainee under arrest and transported him to a detention facility. Id. The following morning, after a series of altercations interspersed with periods of calmness, the detainee became unconscious and eventually died. Id. at 694–95.
>
> In a subsequent § 1983 action against the arresting officer, the mother of the decedent claimed that the officer's decision to transport the detainee to the detention facility instead of a hospital constituted deliberate indifference. Id. at 695. The Fourth Circuit held there to be no objective evidence which informed the officer of the detainee's serious medical need. Id. As the court explained, "at the time of their encounter, [the detainee] exhibited to [the arresting officer] no visible external injuries. He did not have trouble breathing. He was not bleeding, was not vomiting or choking, and was not having a seizure. Furthermore, [the detainee] was conscious, at least somewhat responsive, and able to answer questions." Id. The Court further held that "[the detainee] did not inform [the defendant officer] or any other officer involved of [his] prior medical history. The law cannot demand that officers be mind readers. The medical circumstances that led to [the detainee's] death did not even manifest themselves until the following morning, more than ten hours after [the defendant officer] decided to take [the detainee] to the [detention facility] rather than to a hospital." Id.
>
> Clearly, there are noticeable distinctions between the detainee in Grayson and the decedent in this case. The evidence here is that before the arrest, Stockton appeared, at a minimum intoxicated, which led to his being pulled over. The arresting officer conducted a field alcohol test indicating .00; however, it was clear that Stockton appeared intoxicated on an unknown substance. Stockton explained to the arresting officer as well as numerous others that he had a prescription pill problem that required methadone treatment. Throughout the period of detention lasting at least 15 hours, Stockton's behavior became increasingly critical. The complaint states that he was slurring, at some point he forgot his name, he was confused, he was staggering and required help moving from one area to another, he was having difficulty breathing, he sounded like he was choking, he lay in the fetal position, and he sought help, at a minimum, from the inmates who relayed the request to officers, which included Stockton's statement that he consumed over 40 pills at the traffic stop.

The inmates within the pod also expressed their own concerns about the emergency state of his health to the officers on numerous occasions. Correctional officers likewise sought, but failed to provide, help for Stockton. Lastly, Stockton's mother informed both medical and detention staff of her son's serious drug history and need for monitoring.

In Grayson, the court found that the decedent's "symptoms hardly distinguish[ed] him from the multitude of drug and alcohol abusers the police deal with everyday." Grayson, 195 F.3d at 696. Here, the facts are markedly distinguishable. Stockton was not sleeping off the effects of the intoxicant; rather, his condition was becoming more critical, pronounced, and dire. Importantly, this series of events did not happen over a short, compact period of time, it happened over 15 hours while inmates watched and reported Stockton's struggle. Furthermore, several officers themselves identified and sought to render aid; however, when instructed not to intercede, they did not. In stark contravention of the facts in Grayson, no one was required to be a "mind reader" with regard to Stockton and his situation.

* * * *

Nurse Anumudu next argues that regardless of court's decision on the objective prong, defendants have failed to meet the subjective prong. Specifically, that plaintiff has failed to establish that Nurse Anumudu knew of and disregarded the excessive risk to Stockton. This defendant nurse, however, was told of Stockton's erratic and confused behavior on several occasions. At 10:00 p.m., she was notified to check on Stockton because of his alarming behavior, but she did so only through a glass window. At 10:15 p.m., Officer Lowery again informed a nurse, alleged to be Nurse Anumudu, of Stockton's heroin use, and requested that Stockton be medically screened. At this juncture, she told Officer Lowery that Stockton would be placed on the first floor for observation, but he was not moved for observation or further observed. Furthermore, at 11:39 p.m., in her three-minute medical evaluation of Stockton - wherein Stockton had to be escorted to and from the evaluation stumbling and incoherent - Nurse Anumudu was again made aware of his drug addiction, Stockton told her he had been taking methadone, and she noted "Heroin Protocol." She was aware of the period of time he had been at the facility. Given his current state of intoxication, by all accounts, Nurse Anumudu still did not attempt to identify the source of Stockton's intoxication. She checked "yes" to the question "have you ever been in a hospital for emotional or mental health problems" and referred Stockton to "psychologist/medical," but this was not done. Lastly, at 11:42 p.m., having cleared him, Stockton was placed in an overcrowded general cell pod without providing medical or mental health assistance, and without direction for monitoring. Clearly, as outlined in the complaint, all those who came in contact with him, could assume he was intoxicated, that the intoxication was from

> something other than alcohol, and that the behavior was escalating and becoming more alarming, more exacerbated, and more toxic.
>
> While case law does not permit the presumption of actual knowledge based upon minor symptoms of intoxication, Thompson v. King, 730 F.3d 742 (8th Cir. 2013) (citations omitted), the facts as proffered in the complaint do not outline minor symptoms of intoxication, but high risk and alarming symptoms of which she should have been aware. The complaint does not fail as to the second prong.

8/19/14 Order, pp. 11–15. The court's prior conclusion is further supported by the additional evidence now before the court, including deposition testimony, medical records, and other materials.

Anumudu argues, however, that the video compels summary judgment in her favor. The Fourth Circuit has held that "when a video 'quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" Witt v. W. Va. State Police, Troop 2, 633 F.3d 272, 276 (4th Cir. 2011) (quoting and citing Scott, 550 U.S. at 378, 380). In so holding, the Fourth Circuit relied on the Supreme Court's decision in Scott v. Harris, 550 U.S. 372 (2007), and concluded that Scott

> does not hold that courts should reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers some support for a governmental officer's version of events. Rather, Scott merely holds that when documentary evidence 'blatantly contradict[s]' a plaintiff's account 'so that no reasonable jury could believe it,' a court should not credit the plaintiff's version on summary judgment. As such, Scott simply reinforces the unremarkable principle that "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party" when "there is a 'genuine' dispute as to those facts." Scott, 550 at 380 (quoting Fed. R. Civ. P. 56(c)) (emphasis added).

Witt, 633 F.3d 276-77.

The video produced by defendants has no sound, does not provide footage of coverage of the medical screening, and does not "clearly contradict[] the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, [] [and this] court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" Witt, 633 F.3d at 276. There are genuine disputes of material fact precluding summary judgment which include questions, not limited to, the multiple significant discrepancies in key medical records. Among other things, a number of individuals have indicated that Stockton's state of impairment was readily apparent at the time defendant Anumudu reached a contrary conclusion that while Stockton exhibited no such symptoms of impairment, his condition warranted implementation of the heroin protocol, including administering small doses of Phenergan and Bentyl. Moreover, there appear to be conflicts between Anumudu's deposition testimony concerning her perception of Stockton's degree of impairment; her November 5, 2011, medical screening note; and her November 16, 2011, statement to Investigating Officer Bell, that when she screened Stockton, she knew that he was, in fact, "under the influence of alcohol, barbiturates, heroin, or any other drug" and that "she could tell by the way he was behaving that he was on something." Anumudu also told Investigator Bell that Stockton's "eye were wide open and she could tell that he was on something." Compare, e.g., Bell Report, pp. 35–36, 40, 48, 61, 74, 82, 104, 107, 124–27, 131; and Williams Dep., pp. 20–21, 24; with Anumudu Dep., pp. 20, 52–53, 56–57, 66 & Ex. 4. Thus, the court denies Anumudu's motion for summary judgment as count one of the complaint. The court further finds that plaintiff has demonstrated sufficient evidence to show reckless or callous indifference to her federally protected rights in order to sustain a punitive damages claim

and declines to dismiss plaintiff's request for punitive damages. See Smith v. Wade, 461 U.S. 30, 56 (1983).

B. Count Four (state-law wrongful death, N.C. Gen. Stat. § 90–211.11 et seq.)

1. Public Officer Immunity

Defendants Anumudu and Hester have been sued in their individual capacity for their alleged negligence resulting in Stockton's death on November 6, 2011.[17] On this claim, these defendants assert the defense of public officer immunity. Plaintiff contends these two defendants were public employees rather than public officers.

Under state law, public officers sued in their individual capacity are entitled to immunity for their conduct unless such conduct was malicious, corrupt, or outside the scope of their duties. Meyer, 34 N.C. at 112–13, 489 S.E.2d at 888–89; see Petersen, 2015 WL 5684722, at *10. Public employees, on the other hand, are not entitled to such immunity and may be held liable in their individual capacities for ordinary negligence. Meyer, 34 N.C. at 113, 489 S.E.2d at 889.

In determining whether a defendant is a public officer or public employee, North Carolina courts have held that: 1) a public office is a position created by the North Carolina Constitution or by North Carolina Statutes; 2) a public officer exercises a portion of the sovereign power; and 3) a public officer exercises discretion while a public employee performs ministerial duties. See Murray v. Cty. of Person, 191 N.C. App. 575, 579, 664 S.E.2d 58, 61 (2008). "Additionally, an officer is generally required to take an oath of office while a public employee is not required to do so." Piggott v. City of Wilmington, 50 N.C. App. 401, 273 S.E.2d 752 (1981). In applying

---

[17] Nurses Anumudu and Hester have also been sued in their official capacities. Specifically, plaintiff alleged that Sheriff Harrison, as these nurses' employer, is responsible for their acts and omissions under respondeat superior and vicarious liability.

these factors, the court finds that defendants Hester and Anumudu were public employees and not public officers.

First, in order for a position to be considered statutorily created, the position itself must be clearly established by statute or the statute must provide for the delegation of duties from a statutorily created position to the position in question. See Fraley v. Griffin, 217 N.C. App 624, 627, 720 S.E.2d 694, 696 (2011); see also Green v. Kearney, 203 N.C. App. 260, 267-68, 690 S.E.2d 755, 761-62 (2010) (holding that a county medical examiner is a public officer because his position is established by statute with delegated duties set forth by statute in N.C. Gen. Stat. § 130A–382). In North Carolina, the sheriff has a statutory duty to maintain "the care and custody of the jail" and "shall be, or appoint, the keeper" of the jail. N.C. Gen. Stat. § 162–22. Additionally, the sheriff may appoint "a deputy or employ others to assist him in performing his official duties." Id. However, there is no statute that creates the position of jail nurse, nor is there a statute which defines the role of a jail nurse. Cf. Simmons v. Corizon Health, Inc., 122 F. Supp. 3d 255, ___, 2015 WL 4644812, at *5 (M.D.N.C. 2015), on reconsideration in part on other grounds, 2015 WL 5837541 (M.D.N.C. Oct. 6, 2015). In fact, this court previously dismissed plaintiff's claim, pursuant to N.C. Gen. Stat. § 162–22, that Nurse Anumudu was a keeper of the jail and statutorily charged with and were exercising the sovereign power of the Sheriff to provide for the care, custody, and maintenance of prisoners. 8/19/14 Order, pp. 15–16. Thus, the court concludes that the first factor indicates that Anumudu and Hester are public employees.

The second factor to be considered in determining whether an individual is a public officer or a public employee is whether such individual exercises a portion of the sovereign

power. Again, as discussed above, there is no statute or provision which indicates the nursing defendants were exercising a portion of the sovereign power. Cf. Baker v. Smith, 224 N.C. App. 423, 428–29, 737 S.E.2d 144, 148–49 (2012) (position of assistant jailer is created by N.C. Gen. Stat. §§ 162–22 and –24); 8/19/14 Order, pp. 15–16 (dismissing plaintiff's claim that a nurse is statutory keeper of the jail and exercises the sovereign power of the Sheriff to provide for the care, custody, and maintenance of prisoners).

The third factor in this analysis is that a public officer generally exercises discretion, while a public employee performs ministerial duties. The North Carolina Supreme Court has defined discretionary acts as "those requiring personal deliberation, decision and judgment" and has defined ministerial duties as "absolute" and involving "merely [the] execution of a specific duty arising from fixed and designated facts." Isenhour v. Hutto, 350 N.C. 601, 610, 517 S.E.2d 121, 127 (1999). The North Carolina Court of Appeals has held that "the mere use of judgment, by itself, is not enough to elevate an employee's ministerial duties to discretionary acts. There is some inherent use of judgment involved in virtually every position of employment." See Fraley, 217 N.C. App. at 627, 720 S.E.2d at 697 (holding that emergency medical technician was a public employee, not a public officer); see also Mullis v. Sechrest, 126 N.C. App. 91, 484 S.E.2d 423 (1997), rev'd on other grounds, 347 N.C. 548, 495 S.E.2d 721 (1998) (holding that a public school teacher, while performing the significant and important job of teaching and educating the youth of North Carolina, does not usually exercise the sovereign power and is, therefore, a public employee); Schmidt v. Breeden,134 N.C. App. 248, 517 S.E.2d 171 (1999) (holding that staff members at an elementary after-school enrichment program were public employees not entitled to public officer immunity).

The nursing defendants argue that the Plan only provides guidelines and protocols that are not required to be followed. However, section .4704, entitled Policies and Procedures, describes its objective as "[t]o provide written guidelines for nursing practice, for communication, and implementation of the policies and goals of the Wake County Detention Health Plan" and that "[a]ll staff must comply with the WCD[C] Health Plan and legal developments in the field of Detention Health Care. Noncompliance may leave the employee vulnerable to criminal prosecution and civil liability." Crittenden Dep. Ex. 29. In light of the language in section .4704, it appears that the nursing protocol and directive is ministerial and as such falls solidly within the definition of public employee for prong three. See Fraley, 217 N.C. App. at 628–29, 720 S.E.2d at 697 ("defendant, as an EMT, was required to follow an established treatment protocol . . . . [and] could not deviate from these written protocols without the approval of a physician"); see also, Block v. Cty. of Person, 141 N.C. App. 273, 281–82, 540 S.E.2d 415, 421–22 (2000) (positions of an Environmental Health Specialist and an Environmental Health Supervisor are public employees because the positions are not created by statute and they do not exercise sovereign power; rather, their duties are ministerial).

The final factor to be considered in determining whether an individual is a public officer or a public employee is whether the individual was required to take an oath of office. The nursing defendants assert that this prong is met through the execution of a "Civilian Staff Oath" which is supported by Sheriff Harrison's affidavit. However, while some oaths are statutory or legal requirements, this oath in not. Cf. Isenhour, 350 N.C. at 610, 517 S.E.2d at 128 (noting that police officers, pursuant to N.C. Gen. Stat. § 160A–284, were required to take an oath of office). Regardless of whether this prong is met, the other prongs are not satisfied, and the court finds

that Nurses Anumudu and Hester were public employees at the time of their alleged negligent acts and omissions. Thus, they are not entitled to public officer immunity and summary judgment is denied.

2. N.C. Gen. Stat. § 90–21.11, et seq.

Defendant Hester asserts that plaintiff has failed to forecast sufficient evidence to support a claim that she breached the standard of medical care in violation of N.C. Gen. Stat. § 90–21.11, et seq. The statute provides:

> (a) Except as provided in subsection (b) of this section, in any medical malpractice action as defined in G.S. 90-21.11(2)(a), the defendant health care provider shall not be liable for the payment of damages unless the trier of fact finds by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities under the same or similar circumstances at the time of the alleged act giving rise to the cause of action; or in the case of a medical malpractice action as defined in G.S. 90-21.11(2)(b), the defendant health care provider shall not be liable for the payment of damages unless the trier of fact finds by the greater weight of the evidence that the action or inaction of such health care provider was not in accordance with the standards of practice among similar health care providers situated in the same or similar communities under the same or similar circumstances at the time of the alleged act giving rise to the cause of action.
>
> (b) In any medical malpractice action arising out of the furnishing or the failure to furnish professional services in the treatment of an emergency medical condition, as the term "emergency medical condition" is defined in 42 U.S.C. § 1395dd(e)(1)(A), the claimant must prove a violation of the standards of practice set forth in subsection (a) of this section by clear and convincing evidence.

Id. § 90–21.12.

The evidence in the record is that nurse Hester was working at the WCDC on the date in question. Hester Dep. pp. 18, 35. She was not very busy and near the end of her shift she went to the first floor to see if the intake nurse, Nurse Anumudu, needed any assistance. Id. at 37.

Nurse Anumudu informed her that a detention officer asked her to assess an inmate who "wasn't acting right." Id.; see also Williams Dep. pp. 20–21, 24, 30–31; Lowery Dep. p. 104. If a detention officer expressed concerns to a nurse about an inmate in the general housing pods, the nurse was required to assess the inmate. Fitz Dep. p. 54. At about 10:00 p.m., they did check on Stockton, but admittedly only observed Stockton through the glass. Hester Dep. p. 41.

Defendants specifically argue that both plaintiff's experts Nurse Crittenden and Dr. Kurz failed to offer any specific opinion as to violations of the standard of care by defendant Hester. Dr. Kutz, board certified in emergency medicine with a subspeciality of emergency medical services, opined that the care and treatment rendered by the nurses at the WCDC on November 5–6, 2011, was not in accordance with, and was below, the standard of care. Kurz Dep., Ex. 34. He stated that everyone who interacted with Stockton, including and especially the nurses, should have recognized that Stockton needed emergency care and should have either sent him to the hospital or, at a minimum, ensured that Stockton received heightened supervision. Id. pp. 91–92, 99. Lastly, Dr. Kutz holds the opinion that either admission to the hospital or heightened supervision would have likely led to the emergency medical care required and that had Stockton received such emergency medical care at any time before he stopped breathing, he likely would have survived. Id. Ex. 34. The court therefore concludes that plaintiff has forecast evidence sufficient to survive summary judgment as to defendant Hester and the wrongful death claim.

3. Punitive Damages

Plaintiff seeks punitive damages only as to defendant Anumudu in connection with count four. Nurse Anumudu seeks summary judgment for punitive damages for plaintiff's failure to forecast evidence to support the claim. Mem. Supp. Nurses' Mot. Summ. J., p. 23.

Under North Carolina law, punitive damages are available where negligence is accompanied by an aggravating factor such as fraud, malice, or willful and wanton conduct. See N.C.G.S. § 1D-15(a). Willful and wanton is statutorily defined as follows.

> "Willful or wanton conduct" means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm. "Willful or wanton conduct" means more than gross negligence.

N.C.G.S. § 1D-5(7). Defendant Amumudu's argument fails as to plaintiff's request for punitive damages in connection with her wrongful death claim. Id. Specifically, given the survival of the wrongful death claim on summary judgment, the court finds that plaintiff has pled sufficient facts with supporting evidence to show willful and wanton conduct to sustain a punitive damages claim.

## IV. Motion for Summary Judgment by Sheriff Harrison and Defendants Bayes, Sabas, Brown, Butler, Coley, McClain, and Ohio Casualty Insurance Company

Sheriff Harrison, WCDC Director Dail Butler, Officer Gwen A. Brown, James McClain as Administrator of Melvin Keith McCain, Officer Ebony C. Bayes, Officer Artemio Sabas and Ohio Casualty Insurance Company as surety seek summary judgment on counts one, two, four, five, six, and seven of the complaint.

### A. Count One (violations of 42 U.S.C. § 1983) against Brown, McClain, Sabas, and Bayes

The court described in detail the standard for analyzing a section 1983 claim supra, and reincorporates that discussion here. Again, to prove such a claim, a plaintiff must demonstrate that the defendant "acted with 'deliberate indifference' (subjective) to [his] 'serious medical needs' (objective)." Iko, 535 F.3d at 241 (4th Cir. 2008) (quoting Estelle, 429 U.S. at 104).

Because the court has already concluded that Stockton's critical level of impairment constituted a serious medical condition, the court turns directly to the subjective prong of the inquiry: whether these defendants acted with deliberate indifference.

At 12:17 a.m., defendant Officer McClain escorted Stockton to "the Green Pod." Stockton could not control his movements appropriately, "was not moving very well," and Officer McClain had to help Stockton into the pod. Compl. ¶ 36. Stockton could hardly talk and did not know his name. Id. He appeared intoxicated and pale. Id. He was sweating, and he had difficulty breathing. Id. After the medical screening, Stockton fell asleep on a bench, was difficult to wake, and Sergeant Ransome (with McClain present) shook Stockton to wake him. Ransome Dep. p. 20; McClain Dep. pp. 76, 139–40. Stockton could barely walk and was nodding off while standing up as he was taken to the Green Pod. Id. Stockton was moving very slowly and not breathing well. Ransome Dep. p. 140; Bell Report p. 35. Stockton could barely walk and was nodding off while standing up as he was taken to the Green Pod. Bell Report p. 41.

Throughout the night in question, defendant Sabas, Bayes, and McClain were responsible for the supervision of the Green Pod inmates from 12:24 a.m. to approximately 6:30 a.m. when Officer McClain found Stockton unresponsive on the floor. Compl. ¶ 42. Plaintiff alleges that there were only 11 supervisory rounds between 12:43 a.m. until 6:31 a.m., which cumulatively totaled 15 minutes of supervision to an undisputedly overcrowded cell when Stockton was found. Id. Multiple inmates testify that they repeatedly informed these detention staff that Stockton was in a critical state, appeared to be dying, and required medical attention. Bell Report pp. 35–36.

Furthermore, the court finds that it is undisputed that plaintiff placed six phone calls to the WCDC on November 5, 2011. While plaintiff believes that all of the officers she spoke to were male, the only officer who actually admitted to speaking to her was defendant Brown, a female officer. Plaintiff believes that she spoke to a nurse; however, all the nurses denied speaking to her about her son. Plaintiff testified that she explained to defendant Brown that she was concerned her son had drugs in his system, and requested that he be medically monitored closely. T. Stockton Dep. pp. 152, 154–57. When a detention officer receives a call with this type of information, he or she is required to provide this information to the medical staff and then medical staff is required, at a minimum, to see and assess the inmate and to try to make a determination of the inmate's condition. Smith Dep pp. 59–60; Harrison Dep p. 77. A clinical evaluation of the inmate would also require that this clinical evaluation be noted in the medical records. Id.

Defendants' reliance on the videos in the record to refute this evidence is misplaced. There are serious omissions and discrepancies in the videos. There is a missing portion of video of the "Green Pod," specifically when Officer McClain enters the pod shortly before 4:00 a.m., and there is absolutely no fixed camera footage from 4:00 a.m. through when Stockton was found. Moreover, there is no audio on any of the videos, and as a result the video evidence is wholly inconclusive as to the sounds Stockton was making or conversations between the inmates and the detention officers in the pod.

Given the overt symptoms Stockton exhibited throughout the 15 hours at WCDC, and specifically, from 12:43 a.m. until his death, it is alleged that these defendants either directly observed Stockton's serious medical condition and deliberately ignored it, or were aware of

Stockton's serious medical condition and deliberately chose to do nothing to investigate such condition, or both. Furthermore, the six calls from plaintiff to the WCDC explaining her serious concerns about the medical condition of her son is highly probative of the issues before the court, specifically what defendant Brown and others knew, relayed or failed to relay to medical staff, or completely disregarded. On this record, defendants' motion for summary judgment fails.

Alternatively, these defendants contend they are entitled to qualified immunity. Mem. Supp. Sheriff Defts.' Mot. Summ. J., p. 22-25. Having concluded that plaintiff has successfully alleged violations of clearly established constitutional rights, the court likewise concludes that defendants Brown, McClain, Sabas, and Bayes are not entitled to qualified immunity on the current record. See Pearson, 55 U.S. at 231; Fitzgerald, 457 U.S. at 818. Harlow, 457 U.S. at 818; Gordon v. Kidd, 971 F.2d 1087, 1093 (4th Cir. 1992).

B. Count Four (state-law wrongful death) against Brown, McClain, Sabas, and Bayes

As for count four for wrongful death, plaintiff concedes and the court assumes without deciding that defendants Brown, McClain, Sabas, and Bayes are public officers and would be entitled to public officer immunity. Pl. Resp. Opp'n Sheriff Defts.' Mot. Summ. J., p. 41. As with plaintiff's section 1983 claim against these defendants, the record precludes summary judgment on the wrongful death claim because there are genuine issues of material fact as to whether these defendants' conduct was malicious, corrupt, or outside the scope of their duties. See Cooper, 735 F.3d at 160; cf. Meyer, 34 N.C. at 112-113, 489 S.E.2d at 888–89. Thus, the court denies defendants' motion for summary judgment on this count.

C. Count Two (violations of 42 U.S.C. §§ 1983 and 1988) against Harrison and Butler

Plaintiff's section 1983 claim against defendants Harrison and Butler is couched in Monell, which extends section 1983 liability based on a policy or custom that resulted in the constitutional violation. Monell, 436 U.S. at 694. Defendant Harrison was at the relevant times, the final decision-making authority over policies and personnel of the WCDC. Comp. ¶ 3; Sheriff Defts.' Answ. [D.E. 42] ¶ 3. Defendant Butler was the director of the WCDC and it was his responsibility to direct the daily operations of the detention facilities, including its medical facilities, to ensure the safety and security of staff and inmates. 30(b)(6) Dep. p. 96. As discussed supra in connection with Wake County's motion for summary judgment and fully incorporated here, plaintiff has sufficiently alleged that the WCDC's policies were inadequate and that Stockton's death from a drug overdose was not a isolated incident within the WCDC. Accordingly, the court denies summary judgment as to defendants Harrison and Butler as to count two.

D. Count Five (state-law wrongful death) against Harrison and Butler

Plaintiff concedes that both defendant Harrison and defendant Butler are public officers and would be entitled to public officer immunity. Pl. Resp. Opp'n Sheriff Defts.' Mot. Summ. J., p. 42. As with plaintiff's section 1983 claim against these defendants, the record precludes summary judgment on the wrongful death claim because there are genuine issues of material fact as to whether these defendants' conduct was malicious, corrupt, or outside the scope of their duties. See Cooper, 735 F.3d at 160; cf. Meyer, 34 N.C. at 112-113, 489 S.E.2d at 888–89. Thus, the court denies defendants' motion for summary judgment on count five.

E. Count Six (state-law claim of injury to a prisoner, N.C. Gen. Stat. § 162–55) against Harrison, Butler, Brown, McClain, Sabas, and Bayes

North Carolina General Statute § 162–55 provides that "[i]f the keeper of a jail shall do, or cause to be done, any wrong or injury to the prisoners committed to his custody, contrary to law, he shall not only pay treble damages to the person injured, but shall be guilty of a Class 1 misdemeanor." This statute codifies "long-standing North Carolina precedent that a sheriff and his deputies are liable for their negligence which results in an injury to a prisoner." Ramsey v. Schauble, 141 F. Supp. 2d 584, 591 (W.D.N.C. 2001). To establish a claim for treble damages under N.C. Gen. Stat. § 162-55, a plaintiff must "prove beyond a reasonable doubt that the jailer intended to injure the plaintiff or that the jailer was guilty of criminal negligence." Id. "Criminal negligence" is defined as "such recklessness or carelessness, resulting in injury or death, as imports a thoughtless disregard of consequences, or a heedless indifference to the safety and rights of others." Layman v. Alexander, 294 F. Supp. 2d 784, 796 (W.D.N.C. 2003) (quoting Letchworth v. Gay, 874 F.Supp. 107, 109 (E.D.N.C. 1995)). "Thus, while mere negligence is not sufficient to subject a defendant jailer to liability under § 162–55, reckless indifference to an inmate's safety, resulting in injury or death, is sufficient." Layman, 294 F. Supp. 2d at 796 (citations omitted). Additionally, a sheriff or supervisor may be held liable for the acts of his subordinates under the principles of respondeat superior. Id. (citations omitted).

In this case, plaintiff has alleged that each of these defendants was deliberately indifferent to Stockton's constitutional rights and as a result died after 15 hours in the custody and care of these defendants. Thus, on this record, defendants' argument fails. Layman, 294 F. Supp. 2d at 796; Ramsey, 141 F. Supp. 2d at 591; Letchworth, 874 F. Supp. at 109.

F. Plaintiff's Official Capacity State Law Claims

As for any state law claim against the Sheriff defendants in their official capacities, these defendants are entitled to governmental immunity except to the extent waived by the purchase of insurance or a surety bond. Pl's Resp. Opp'n Sheriff Defts.' Mot. Summ. J., p. 41, 43; Mem. Supp. Sheriff Defts.' Mot. Summ. J., p. 34-35, 39-40 (citing N.C. Gen. Stat. § 153A–435); see White v. Cochran, 748 S.E.2d 334, 339–40 (N.C. Ct. App. 2013). A county may waive governmental immunity by purchasing insurance, but any waiver is limited to the extent of the insurance coverage. See, e.g., N.C. Gen. Stat. §153A–435(a); Evans v. Hous. Auth., 359 N.C. 50, 57, 602 S.E.2d 668, 673 (2004); Satorre v. New Hanover Cty. Bd. of Comm'rs, 165 N.C. App. 173, 176, 598 S.E.2d 142, 144 (2004). If "the insurance policy does not indemnify [the] defendant against the negligent acts alleged in plaintiff's complaint, defendant has not waived its sovereign immunity." Doe v. Jenkins, 144 N.C. App. 131, 135, 547 S.E.2d 124, 127 (2001); see Dawes v. Nash Cty., 357 N.C. 442, 445–46, 449, 584 S.E.2d 760, 763, 765 (2003); Estate of Earley ex rel. Earley v. Haywood Cty. Dep't of Soc. Servs., 204 N.C. App. 338, 341, 694 S.E.2d 405, 408 (2010).

The Sheriff defendants assert that their liability is capped at $20,000. Mem. Supp. Sheriff Defts.' Mot. Summ. J., pp. 36, 39-40. The court declines to make a determination as to the liability cap at this time. The Sheriff defendants may reassert this argument at trial.

**Conclusion**

In sum, for the reasons stated, the court GRANTS IN PART and DENIES IN PART the motions for summary judgment. The court GRANTS Wake County's motion for summary judgment [D.E. 102] on count five of the complaint and DENIES summary judgment on count

three. The remaining summary judgment motions [D.E. 104, 107, 109] are DENIED in full. The court further GRANTS the unopposed motion to withdraw [D.E. 137] by Andrew C. Bucker as counsel for defendant Umesi pursuant to Federal Rule of Civil Procedure 7(b).

SO ORDERED, this the 24 day of March 2016.

TERRENCE W. BOYLE
United States District Judge